## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUSINESSING LLC, on behalf of itself and all others similarly situated, | Case No.: 1:26-cv-01655 |
| *Plaintiff*, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| RUNWAY AI, INC., | |
| *Defendant*. | |

Plaintiff, Businessing LLC ("BLLC" or "Plaintiff"), brings this class action complaint ("Complaint"), individually and on behalf of all others similarly situated (the "Class Members") against Runway AI Inc., ("Runway" or "Defendant") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to herself and her own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

### NATURE OF THE ACTION

1.      This is a nationwide class action for violations of the DMCA, arising from Defendant unlawfully circumventing technological measures to access and scraped thousands of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize a large-scale generative artificial intelligence ("AI") model.

2.      Defendant is currently designing, training and building an artificial intelligence system capable of generating video output from text and image input. This "text to video" system is intended to allow consumers to generate images and videos using text and image prompts.

3.      The technology Defendant has and continues to develop is now a core feature within the products Defendant offers to its users.

4. YouTube allows the public to view audiovisual works only through controlled streaming and never provides access to the underlying video files.

5. YouTube also employs technical measures designed to control access to the underlying audiovisual files and to prevent bulk extraction by automated systems.

6. YouTube's technical controls are designed to provide access through user-based streaming and to prevent non-authorized bulk extraction. At the scale required for modern AI training, like those created by Runway, obtaining file-level copies of the Works necessarily requires bypassing those controls.

7. Defendant intentionally bypassed those restrictions by deploying scraping tools designed to evade YouTube's access protections. Defendant used a video-downloading program combined with virtual machines that rotated IP addresses to avoid detection and blocking. By scraping and downloading those files in order to build its generative AI products, Defendant deliberately circumvented YouTube's access controls.

8. Defendant used Plaintiff's and Class Members' intellectual property for its own commercial gain. In doing so, Defendant has violated YouTube's Terms of Service, which were intended to protect Plaintiff and others similarly situated.

9. Plaintiff and the Class Members are content creators who upload their audiovisual content to YouTube. In doing so, the content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software and Terms of Service. In fact, YouTube's anti-circumvention software and protective Terms of Service are a driving factor behind content creators' decision to upload their video content to YouTube.

10. Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos at scale

without consent or compensation.

11.    Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

12.    Content creators such as Plaintiff and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI. Once AI ingests content, that content is stored in its neural network, and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

13.    Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's technological protection measures to safeguard their files from unauthorized access. Because copyright registration is not a prerequisite for protection against unlawful circumvention of access controls, this claim is especially critical where Defendant's misconduct lies in breaking through access barriers that prevent anyone from obtaining the underlying files in the first place

14.    Plaintiff Businessing LLC., DBA Ali Spagnola is a corporate entity incorporated in California with its headquarters in Los Angeles, California.  The channel is @alispagnola on the YouTube platform.  It has over 2,590,000 subscribers and millions of views.  Plaintiff invested substantial time and money into bringing awareness around its content.

15.    Like Plaintiff, the Class Members in this case are independent content creators who uploaded their video content to YouTube's video platform. The video content of Class Members was also part of the dataset utilized by Defendant to train its AI model.

16.     An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

17.     Defendant has profited and will continue to profit substantially from its infringement of Plaintiff's and Class Members' video content through Defendant's training of its generative AI products. Defendant's financial and technological success would not have been possible without the video content created by Plaintiff and Class Members, which was intended for streaming on YouTube.

18.     Plaintiff brings this class action on behalf of itself and of a nationwide class of YouTube creators whose works were scraped, ingested, and trained on without authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the Digital Millennium Copyright Act, 17 U.S.C.A. § 1201(a), seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement. More particularly, Defendant's conduct violates the provisions of the DMCA regarding anti-circumvention (§1201) by bypassing technological protection measures that control access to and copying of YouTube videos.

## **THE PARTIES**

19.     Plaintiff BLLC is a California-based media company that owns and operates the YouTube channel "Ali Spagnola." BLLC's channel appears extensively in the dataset Defendant used to train its artificial intelligence model. BLLC has at least 1200 videos Defendant scraped from YouTube in order to train its generative AI model. BLLC invested significant resources into producing and publishing this video content, and every scraped videos was downloaded, copied, and ingested by Defendant without authorization.

20.     Defendant Runway AI, Inc. is a Delaware corporation with its principal place of business at 18 West 18th Street, Floor 11, New York, New York 10011.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Runway. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, et seq. (the Digital Millennium Copyright Act ("DMCA")).

22.     Personal jurisdiction is proper because Defendant's principal place of business is in New York, New York, and because Defendant transacts business nationwide, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here.

23.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

## FACTUAL BACKGROUND

### A.     Content Creators, YouTube and Technological Protection Measures

24.     As noted above, Plaintiff and the Class Members are independent content creators of audiovisual content.

25.     Plaintiff and the Class Members create video content and upload their video content onto YouTube's video sharing platform.

26.     YouTube is a video-sharing platform on which creators upload original audiovisual works. Those works are protected by copyright, and creators retain rights and control over licensing and other downstream uses.

27.     YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to music videos for free on YouTube's ad-supported service, but YouTube does not give users access to or allow downloading of the digital files for the content viewed by the user.

28.     YouTube deploys technological protection measures ("TPMs") designed to control access to the underlying video files and prevent direct downloading outside permitted channels (e.g., streaming-only delivery, application programming interface ("API") usage limits, and access controls).

29.     YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs.[1] These contractual restrictions operate together with TPMs to prevent unlicensed access to creators' videos.

30.     According to YouTube's Terms of Service, Content creators such as Plaintiff who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services; however, the license makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[2]

---

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed February 10, 2026) (prohibiting "access[ing] the Service using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission").

[2] *Id.*

31.    This language confirms that end users are not given access to the file itself, only the ability to view (i.e., stream) through YouTube's controlled environment. YouTube's Terms of Service reflect YouTube's intent to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

32.    Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening for free but seeing ads, versus possessing a permanent digital copy.

33.    Accordingly, scraping or bulk downloading is not merely copying material already provided; it is an act of unauthorized access to data files that YouTube affirmatively withholds from public download.

34.    In order to enforce its prohibitions on downloading content, YouTube does not provide a downloading option that is readily available to users.

35.    Although YouTube does offer downloading options to customers who subscribe and pay for YouTube's "Premium" plan, YouTube also employs TPMs to prevent access for Premium customers. Specifically, YouTube prohibits all downloading audiovisual content except to the YouTube app. Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium customer with access to the audiovisual files. Accordingly, the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are only available for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again.

36.    For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

37.    In addition, YouTube maintains a framework based on express permission that allows creators to decide whether third-party AI companies may use their YouTube videos for AI model training.

38.    Under YouTube's policy and settings, creators may permit third-party training only by turning on a "third-party training" setting and selecting which third-party companies, if any, are allowed.

39.    By default, YouTube's third-party training setting is turned off—meaning creators do not need to take any action to withhold permission, and third-party training is not authorized unless the creator affirmatively opts in.

40.    Even when a creator chooses to opt in, YouTube requires the creator to make an affirmative choice: either (a) select one or more companies from YouTube's list of participating third-party AI companies, or (b) choose an "All third-party companies" option that grants permission broadly.

41.    In other words, YouTube does not treat creators as having granted permission to any third-party AI company unless and until the creator affirmatively authorizes such use.

42.    YouTube's list of third-party companies presented to creators includes major AI developers, including Runway itself, reflecting that YouTube contemplated that third-party AI developers would require explicit creator permission before using YouTube videos for training.

43.    In order to further enforce its prohibitions on downloading content, YouTube uses technological processes and tools to detect and block unauthorized downloading. For example, YouTube occasionally updates APIs, which operate to interfere with downloaders utilizing the non-updated API to extract files. As another example, YouTube monitors downloading activity and may block IP addresses that make too many download attempts in a specified time period.

44.     YouTube's refusal to provide users with a readily available downloading option, along with the processes and tools YouTube employs operate to restrict users' ability to access audiovisual material, are part of the TPMs that YouTube has employed to prohibit access to audiovisual files.

45.     Content creators, including Plaintiff and Class Members, rely on the TPMs contained in YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube. Content creators, including Plaintiff and Class Members, expect that their works will not be copied at scale without consent.

### B.    Defendant Improperly Obtained Millions of YouTube Videos to Train Its Foundational AI Model

46.     Defendant is a multi-billion-dollar technology company that develops and commercializes generative artificial intelligence tools focused on video creation, editing, and synthesis. Defendant's flagship AI video model, released publicly as "Gen-3," is marketed as a cinematic text-to-video and image-to-video generation system for commercial users, creators, and enterprise customers.[3]

47.     Defendant released Gen-3 to widespread industry praise and positioned the model as a major technological advancement in AI video generation. Defendant has raised substantial venture funding and operates Gen-3 as a commercial product intended to drive revenue, market share, and competitive advantage in the generative AI sector.[4]

48.     When asked publicly to identify the source of Gen-3's training data, Defendant declined to disclose specifics. Defendant's co-founder stated only that the company uses "curated,

---

[3] Samantha Cole, *Runway Ripped Off YouTube Creators*, 404 Media (July 25, 2024), available at: https://www.404media.co/email/64056c13-be6e-46e7-8c90-b53dd30026f2/?ref=werd.io (last accessed February 17, 2026)

[4] *Id.*

internal datasets," without revealing how those datasets were assembled or whether they included copyrighted audiovisual works obtained from third-party platforms.[5]

49.    In 2024, investigative journalists obtained a large internal spreadsheet originating from Defendant that cataloged thousands of YouTube channels and individual videos compiled for AI training purposes. The spreadsheet lists major media brands, entertainment companies, and independent creators whose content appears to have been targeted for ingestion into Defendant's training pipeline.[6]

50.    Upon information and belief, the spreadsheet reflects a coordinated company-wide effort inside Defendant to identify, categorize, and collect high-quality YouTube videos for use as training material. Categories in the document include curated thematic collections, cinematic footage, influencer content, and specialized clips selected for fine-tuning Defendant's model.[7]

51.    The spreadsheet contains approximately 3,968 unique YouTube channels containing over one-hundred thousand unique videos.[8]

52.    A former Defendant employee reported that, after the spreadsheet was compiled, Defendant used automated scraping tools to download the identified videos from YouTube at scale. According to that employee, Defendant employed open-source downloading software together with proxy infrastructure specifically configured to avoid detection and blocking by YouTube.[9]

53.    The former employee stated that Defendant used a large automated crawler to

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

download videos from the listed channels while routing requests through purchased proxy services in order to defeat YouTube's access restrictions. This workflow was designed to extract underlying video files that YouTube does not make available for public download.[10]

54.    Because Defendant's intent is to target consumers in an already competitive field of AI text-to-video and image-to-video models, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to obtain the massive dataset necessary to fuel Defendant's generative AI efforts and, by extension, Defendant's success in the field of AI text-to-video and image-to-video models.

55.    Defendant has invested in its generative AI products and has also fundamentally collaborated on improving generative capabilities. Particular to the current case, Defendant has sought to develop its generative AI product so it is capable, among other things, of turning language and image prompts into audiovisual content. In other words, Defendant has sought to, and has had some success with, creating an AI product that accepts language instruction or images and produces a video based on that instruction or image.

56.    In order to adequately train its generative AI systems, Defendant requires vast amounts of data—the more data, the better the AI product. Upon information and belief, Defendant's scraping operations were undertaken for the purpose of training and improving Gen-3 and related commercial AI video systems. Defendant required vast quantities of audiovisual data to enhance realism, motion, cinematography, and stylistic diversity in its generative outputs.

57.    Defendant's acquisition of YouTube videos was not academic research or isolated experimentation. It was a commercially driven effort to accelerate development of a revenue-

---

[10] *Id.*

generating AI platform. Defendant's success in the competitive AI video market depended on ingesting large volumes of creators' content without authorization.

58.    In order to acquire high-quality text-to-video and image-to-video generation, Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

59.    "Scraping" content involves downloading audio and video files from a website, in this case YouTube, using an automation of some type.

60.    When Defendant scraped audio and video files from YouTube, Defendant did not simply download those files onto the YouTube app for offline streaming, as envisioned by YouTube's Premium plan. Instead, Defendant improperly accessed the actual audio and video files and downloaded those files into Defendant's own system, where Defendant had control over the files and where Defendant could store them indefinitely. These actions are inconsistent with YouTube's Premium plan.

61.    To fuel its scraping activities, Defendant created a vast internal dataset.

62.    The scraping activities Defendant conducted on YouTube's video sharing platform required Defendant to use processes to defeat protections that YouTube put in place to prevent unauthorized access to the digital files underlying the audiovisual content. The processes used by Defendant to scrape audiovisual files from YouTube are not used in the ordinary course of YouTube's operations from the point of view of an ordinary consumer.

63.    Defendant used tools and processes such as the open-source YouTube video downloader "yt-dlp" combined with virtual machines that refresh IP addresses to access

audiovisual content from YouTube's platform. Such tools and processes are necessary for Defendant to avoid being blocked by YouTube.

64.    The use of virtual machines to refresh IP addresses is necessary because YouTube uses programs to monitor the activity from IP addresses for downloading activity and block those IP addresses from accessing audiovisual data on the YouTube platform. Refreshing the IP addresses operates to defeat YouTube's monitoring programs.

65.    The yt-dlp downloader is a tool used for downloading videos and audio from online platforms such as YouTube. The yt-dlp downloader can be used to automatically merge separate audio and video streams and download entire playlists, among other tasks, and Defendant used the yt-dlp downloader for these very purposes in downloading files from YouTube.

66.    To use yt-dlp, Defendant first had to install the program, which can be downloaded from the official yt-dlp page on GitHub, along with other programs necessary to effectively download files, such as programs for merging video and audio files. Once installed, yt-dlp can be used to download individual files or entire playlists by adding the Uniform Resource Locator ("URL"), which is essentially a web address and mechanism for retrieving a specific file, for each desired video to the yt-dlp program.

67.    Defendant used programs such as yt-dlp to improperly access and download files and merge data in order to feed complete audiovisual packages to its generative AI model for training purposes.

68.    Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to scrape content from YouTube, and feed content directly to its generative AI system.

69.    Defendant did not obtain the consent of YouTube, Plaintiff or other creators of the

14

audiovisual content to conduct its scraping activities.

70.    On information and belief, and based on the sheer volume of video data included, the dataset of videos that included YouTube videos were scraped without permission from YouTube and in violation of YouTube's Terms of Service.[11]

71.    The scraping and acquisition processes used by Defendant were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid scraping and mass downloading of videos.[12]

72.    In fact, YouTube's CEO, Neal Mohan has stated that, "From a creator's perspective, when a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said. "It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."

73.    The automated system used by Defendant to access video content from YouTube was intentionally designed and utilized to circumvent YouTube's TPMs.

74.    To be clear, Defendant's generative AI system is not "watching" YouTube in order to be trained. Rather, data improperly accessed and downloaded from YouTube is being uploaded into Defendant's generative AI system in order to develop and improve Defendant's products.

75.    Defendant knew or should have known its conduct contravened YouTube's rules and the TPMs that enforce them.

76.    Despite its knowledge, Defendant continued its program of improperly accessing

---

[11] YouTube's Terms of Service "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed February 10, 2026) (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

[12] *Id.*

YouTube data and using the audiovisual content it improperly accessed to train its generative AI model.

77.     Runway's circumvention was willful. Runway is a sophisticated technology company familiar with platform access controls and anti-scraping protections, and Runway knowingly chose circumvention-based acquisition rather than licensing creators' works through authorized channels.

78.     On information and belief, Runway mass acquisition of YouTube videos for AI training involved "circumvent[ing] a technological measure that effectively controls access" to copyrighted audiovisual works, within the meaning of 17 U.S.C. § 1201(a).

79.     On information and belief, Runway further "avoid[ed], bypass[ed], remove[d], deactivate[d], or impair[ed]" technological measures designed to restrict unauthorized retrieval and copying of YouTube content, including at a scale far beyond ordinary consumer viewing.

80.     Runway's conduct was not an incidental or accidental access event; rather, it was undertaken deliberately and systematically to acquire an enormous volume of copyrighted audiovisual works for use in training commercial AI systems.

## C.     Defendant's Actions Were At All Times Commercially Driven

81.     Defendant's efforts to train its generative AI products were not merely for "research" purposes, but rather primarily served Defendant's own commercial and financial interests.

82.     As noted above, Defendant's work on generative AI products is not a research tool or isolated project but rather is intended to produce a commercially competitive generative AI video model that envisions creators and artists as its target market.

83.     Defendant has numerous financial interests related to its generative AI products,

including its interests as the owner of Snapchat.

84.     AI is a significant aspect of Defendant's core product.

85.     Accordingly, Defendant has an interest in improving upon its AI features in order to increase its market among both content creators and viewers on Defendant's other products and services that Defendant markets.

86.     Defendant's effort to train its generative AI product is commercially driven.

87.     Defendant has at all times intended to create a well-trained generative AI product that Defendant can integrate into its existing technology, that will give Defendant an advantage in competition against its competitors in the AI technology sphere, and that Defendant can leverage for commercial purposes in order to increase its own profitability.

**D.     Defendant's Actions Caused Harm to Plaintiff and Class Members**

88.     At no time did Defendant seek or obtain Plaintiff's or Class Members' authorization to access and use the videos Defendant used to train its generative AI models

89.     At no time did Defendant seek or obtain Plaintiff's or Class Members' authorization, nor did Defendant compensate Plaintiff or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

90.     Creators like Plaintiff and the Class Members cannot meaningfully "undo" what Defendant has done. Once an AI system ingests a work during training, as is the case here, the value of that work is extracted and embedded into the model in ways that cannot be reliably removed or recalled.

91.     Plaintiff and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's terms and service that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data

mining of audiovisual content utilized by Defendant to obtain Plaintiff's video content.

92.    Defendant intentionally violated Plaintiff's and Class Members' intent and rights to their content by accessing Plaintiff's and Class Members' video content to train Defendant's generative AI model.

## CLASS ACTION ALLEGATIONS

93.    **Class Definition:** Plaintiff brings this action on behalf of itself and other similarly situated individuals defined as follows:

> All persons and entities in the United States who are creators and/or rights-holders of YouTube-hosted videos that Runway accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube through circumvention of YouTube's TPMs (the "Class").

94.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

95.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

96.    <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party YouTube's records.

97.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class because Plaintiff's Works were included in the datasets used by Runway in the training of Runway's AI models. Runway unlawfully accessed and downloaded the Works through the use of technological

measures aimed at circumventing YouTube's TPMs. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

98.     Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

99.     Common Questions of Law and Fact Predominate. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.   The following questions of law and fact are common to the Class:

    a.    Whether YouTube employs "technological measures that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a).

    b.    Whether Runway accessed YouTube-hosted videos at the file level to obtain training-ready copies, clips, frames, or other stored representations of Class members' Works.

    c.    Whether Runway retrieved, scraped, downloaded, or otherwise acquired the YouTube videos from the unique dataset created by Runway at massive scale to build training material for its AI systems.

d.      Whether Runway's methods for retrieving YouTube videos defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs.

e.      Whether Runway thereby violated 17 U.S.C. § 1201(a)(1) by circumventing technological measures controlling access to Class members' Works.

f.      Whether Runway's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain.

g.      Whether Runway's conduct caused Class wide injury by depriving creators and rights-holders of control over access to and use of their Works and by enabling Runway's ongoing possession and use of unlawfully accessed copies within its training pipelines.

h.      Whether Plaintiff and Class members are entitled to declaratory and injunctive relief requiring Runway to cease circumvention-based access to YouTube-hosted Works and to implement compliance measures sufficient to prevent further circumvention.

i.      Whether Plaintiff and Class members are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Runway's violations of 17 U.S.C. § 1201.

100.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured

persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF 17 U.S.C. § 1201(a)
### (DMCA ANTI-CIRCUMVENTION)

101.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

102.    YouTube's Terms of Service prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content. These restrictions operate together with TPMs to prevent unlicensed access to the underlying video files, not simply reproduction of content.

103.    Plaintiff and Class Members uploaded their original video content to YouTube's video sharing platform due in substantial part to YouTube's Terms of Service and TPMs prohibiting bulk downloading of creators' videos.

104.    Content creators, including Plaintiff and Class Members, expect that their works will not be accessed at the file level and copied at scale without consent.

105.    YouTube's Terms of Service and associated access controls constitute "effective technological measures" within the meaning of 17 U.S.C. §1201.

106.    Defendant used automated tools for the sole purpose of circumventing YouTube's access barriers and extracting files never made available to the public. In doing so, Defendant improperly obtained millions of videos from YouTube's platform.

107.    This distinction is critical: viewing a YouTube video through YouTube's platform does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under §1201.

108.    Defendant accessed, downloaded, stored and utilized those videos to assemble training corpora for Defendant's AI models and services.

109.    Each act of circumvention constitutes a separate violation of §1201. Plaintiff and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

110.    Each of Defendant's acts of infringement is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment in its favor and against Defendant as follows:

A.    For a declaration that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiff's and the Class Members' audiovisual content.

B.    For statutory damages (up to the maximum allowed by law per violation), injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

C.    For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiff's and the Class Members' copyright-protected content, including a preliminary and permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors,

assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiff's or the Class Members' exclusive rights under federal law, including without limitation in the content identified in Exhibit A;

D.    For an award of Plaintiff's costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

E.    For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendant; and

F.    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: February 27, 2026

> */s/ Mark K. Svensson*
> Mark K. Svensson (NY Bar No. 5974290)
> **MILBERG, PLLC**
> 405 East 50th Street
> New York, New York 10022
> Tel.: (202) 975-0468
> msvensson@milberg.com
>
> *Counsel for Plaintiff and the Putative Class*